### IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMSC-003

Filing Date: January 5, 2010

Docket No. 30,896

STATE OF NEW MEXICO,

        Plaintiff-Appellee,

v.

THOMAS VIGIL,

        Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**William C. Birdsall, District Judge**

Hawk Law, P.A.
Sharon B. Hawk
Albuquerque, NM

Romero & Associates, P.A.
Joe M. Romero, Jr.
Albuquerque, NM

for Appellant

Gary W. King, Attorney General
Andrew S. Montgomery, Assistant Attorney General
Santa Fe, NM

for Appellee

### OPINION

**DANIELS, Justice.**

{1}    Defendant Thomas Vigil, convicted of first-degree murder on a theory of accessorial liability, raises several challenges on appeal. Because we conclude that his conviction must be reversed for insufficiency of evidence, we find it unnecessary to reach any other issue.

1

**I.    PROCEDURAL BACKGROUND**

**{2}**    Defendant was charged with several criminal offenses in connection with the October 21, 2005, shooting death of Carlos Escobar:  Count I, first-degree murder, contrary to NMSA 1978, Section 30-2-1 (1994); Count II, shooting at or from a motor vehicle and causing injury, contrary to NMSA 1978, Section 30-3-8 (1993);  Count III, assault with intent to commit a violent felony, contrary to NMSA 1978, Section 30-3-3 (1977); Count IV, receipt, transportation, or possession of firearms or destructive devices by a felon, contrary to NMSA 1978, Section 30-7-16 (2001); and Count V, intentionally distributing or possessing with intent to distribute methamphetamine, contrary to NMSA 1978, Section 30-31-22(A) (2005) (amended 2006).

**{3}**    Counts IV and V were severed for a separate trial and present no issues in this appeal. At his jury trial on the remaining counts, Defendant was acquitted on Counts II and III and convicted only on Count I, first-degree murder.  Because he was sentenced to the mandatory term of life imprisonment, we review Defendant's conviction on direct appeal.  *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court.").

**II.    DISCUSSION**

   **A.    *Standard of Review.***

**{4}**    Defendant has challenged his conviction on the ground, among others, that it is not supported by substantial evidence.  As we observe in *State v. Flores*, 2010-NMSC-002, ¶ 2, __ N.M. __, __ P.3d __ (No. 29,650, January 5, 2010), filed this same date:

> Our substantial evidence review of the sufficiency of the evidence to support a conviction must take into account both the jury's fundamental role as factfinder in our system of justice and the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture.

To avoid usurping the jury's important responsibilities, "we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (filed 1998) (reversing a kidnapping conviction and affirming other convictions on a substantial evidence review).  While we cannot substitute our own judgment for that of the jury in weighing the evidence, our own responsibility as a court requires "scrutiny of the evidence and supervision of the jury's fact-finding function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Baca*, 1997-NMSC-059, ¶¶ 7, 13, 56, 124 N.M. 333, 950 P.2d 776 (quoting *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992)) (internal quotation marks omitted) (affirming conviction of aiding and abetting where there

2

was evidence that the defendant knew his passenger was carrying a gun, pursued the decedent's car in a threatening manner, aligned his car next to decedent's to put his passenger into a position to fire into decedent's car, and laughed after the passenger fired the fatal shot). This responsibility to ensure that the State has introduced sufficient evidence to justify a finding of guilt is founded on "the constitutional requirement of due process." *Id.* ¶ 13.

**{5}**      The State has candidly acknowledged that, because the jury found Defendant not guilty of personally shooting Escobar, the substantial evidence analysis necessarily must address whether the evidence was sufficient to support a finding of guilt under a theory that Defendant aided and abetted one or more other persons in the murder for which he was convicted. We therefore turn to an examination of the trial evidence in the light most favorable to the verdict, resolving all conflicts and indulging all permissible inferences in favor of upholding the conviction, while exercising our own responsibility to ascertain whether there was sufficient evidence for any reasoning factfinder to conclude beyond a reasonable doubt that there was evidence establishing Defendant's guilt.

### B.      *Trial Evidence*.

**{6}**      The fatal encounter was precipitated by a dispute over a debt Escobar owed Defendant's cousin, Anthony Jacquez. Around noon on the date of the killing, Escobar and two friends were traveling in his truck to a cousin's house looking for money to pay off his debt to Jacquez when they passed Jacquez and Defendant.  Jacquez turned his vehicle around and followed Escobar's truck to its destination. After the occupants got out of their vehicles and began walking toward Escobar's cousin's house, Jacquez "blindsided" Escobar, grabbed his arm, and hit him in the head with a pair of brass knuckles, knocking him to the ground. After Defendant and Jacquez kicked Escobar as he lay on the ground, they drove away from the scene. Escobar, who was dizzy and disoriented after the assault, had to be helped by his friends back into his truck.

**{7}**      Escobar's mother, Terry Duran, came home later that afternoon and became angry when she saw that her son had been severely beaten. Without telling Escobar, she decided to drive over to Yvonne Martinez's trailer home to find out where Jacquez was living. Duran had known Jacquez and Defendant for over a decade and knew that Yvonne Martinez was the mother of Defendant's girlfriend, Heather Martinez. Defendant was known to have lived from time to time with Heather and Yvonne Martinez.

**{8}**      Terry Duran arrived at the Martinez mobile home at the same time as Yvonne Martinez arrived. In response to Duran's question about where Jacquez lived, Martinez pointed to Shawn Casaus's mobile home, which was located one hundred yards away, across a county road. Jacquez was house sitting for Casaus at the time because Casaus was out of town. Jacquez, his brother Jared, Casaus, and Defendant were lifelong friends who were known to "hang out together."

**{9}** Escobar realized his mother was gone shortly after she left, and he and two friends jumped into his truck to follow her over to the Martinez trailer. Within moments of the time Duran and Martinez arrived at the trailer, a number of vehicles converged in front. Escobar pulled up behind his mother's car, then Escobar's girlfriend, Darcy Clevenger, who followed Escobar upon seeing him drive up the road, pulled in behind Escobar. Shortly afterward, Defendant and Heather Martinez were coincidentally dropped off at her home after the two of them had visited a friend's house. The car Defendant was riding in pulled into the driveway sideways behind Clevenger's car, blocking her in.

**{10}** Angered at Escobar's unexpected presence at his residence, Defendant got out of the vehicle in a rage, yelling obscenities and throwing rocks at Clevenger's car and Escobar's truck. As he went toward Escobar's truck, Defendant screamed, "Why are you fucking disrespecting my house like this?" When Defendant reached the driver's side of Escobar's truck, he punched Escobar twice through the open window. Escobar then pulled a .45 caliber pistol from his waistband and shot Defendant several times, with the first shot going into Defendant's chest. Defendant immediately fell to the ground and remained there until he was later taken to get emergency medical care. Defendant survived gunshot wounds to his hand and abdomen, which were characterized as "extremely serious" and "very life-threatening" by his trauma surgeon. While no gun attributable to Defendant was recovered, there was conflicting testimony as to whether Defendant fired a shot before he fell or had a gun with him at all.

**{11}** Immediately after Escobar shot Defendant, he threw his truck into reverse and sped backwards down the driveway toward the road, showering gravel as he went. As the truck was reversing, one of Escobar's passengers, Jacob Young, started shooting a gun over the truck and yelling at Escobar to "shoot him . . . he ain't dead." Anthony Jacquez, Jared Jacquez, and Larry Abeyta, who had not arrived with Defendant, had not been with Defendant and Heather Martinez on their preceding visit to their friend's house, and had not been previously observed during the confrontation between Defendant and Escobar at the Martinez trailer, then appeared in the area and fired a barrage of gunshots into Escobar's truck as it reached the county road between the Martinez property and the Casaus property. The vehicle came to a stop across the road in the bar ditch. Escobar was hit several times, dying instantly. Jacob Young survived gunshots to his chest and back.

**{12}** The State and defense stipulated to the jury (1) that Larry Abeyta had admitted firing multiple shots into Escobar's vehicle after Defendant had been shot and (2) that Abeyta had been convicted of the felony of shooting at a motor vehicle resulting in great bodily injury.

**{13}** To support Defendant's charge of first-degree felony murder, the State relied on alternative theories: either Defendant personally committed the predicate felony of shooting at a motor vehicle resulting in great bodily harm, thereby causing the death of Escobar, or Defendant was an accessory to another person's shooting at Escobar's vehicle. The district court instructed the jury on the two felony murder theories: felony murder as a principal under UJI 14-202 NMRA and felony murder as an aider or abettor who "helped, encouraged

4

or caused the killing to be committed." UJI 14-2821 NMRA. Although the jury convicted Defendant of felony murder without specifying its underlying theory, it acquitted him of the charge of shooting at a motor vehicle resulting in great bodily harm, as well as the charge of assault with intent to commit a violent felony.

### C.  *Analysis of the Sufficiency of the Evidence to Support a Conviction of Aiding and Abetting.*

**{14}**   In its briefing before this Court, the State agreed with Defendant that the jury could only have based its murder conviction on an aiding and abetting theory, rather than a theory that Defendant had shot Escobar himself, because the jury acquitted Defendant on the only charge that could have been the predicate felony under a principal theory, shooting at a motor vehicle. As a consequence, our review must focus on whether the evidence was sufficient to support a reasonable conclusion that Defendant was guilty as an accessory to the murder of Escobar.

**{15}**   A defendant "may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission" by another. NMSA 1978, § 30-1-13 (1972). "For accomplice liability, the State must show not only [that a defendant was] aiding in the commission of the killing but also that the defendant intended that the underlying felony be committed and 'intended the killing to occur or knew that [he] [she] was helping to create a strong probability of death or great bodily harm.'" *State v. Fry*, 2006-NMSC-001, ¶ 23, 138 N.M. 700, 126 P.3d 516 (second and third alteration in original) (quoting UJI 14-2821). Under the law, "a jury cannot convict a defendant on accessory liability for a crime unless the defendant intended the principal's acts." *State v. Carrasco*, 1997-NMSC-047, ¶ 9, 124 N.M. 64, 946 P.2d 1075 (affirming the intent requirements in the required aiding and abetting elements instruction). The two separate requirements, intent by a defendant that another person commit the offense and an act on a defendant's part to cause the other person to commit it, are based on the general principle of criminal culpability that "the *actus reus* element of a crime is distinct from the *mens rea* element . . . ." *State v. Schoonmaker*, 2008-NMSC-010, ¶ 48, 143 N.M. 373, 176 P.3d 1105 (observing that a conviction of child abuse cannot be sustained in the absence of sufficient evidence of both elements).

**{16}**   The aiding and abetting elements instruction in this case set forth the essential elements the evidence must establish in order for a jury to be able to convict Defendant as an aider and abettor to felony murder:

> The defendant Thomas Vigil may be found guilty of felony murder as charged in Count 1, even though the defendant did not commit the murder if the state proves to your satisfaction beyond a reasonable doubt that:
> 1. The felony of shooting at a motor vehicle was committed;
> 2. The defendant Thomas Vigil helped, encouraged or caused the felony of shooting at a motor vehicle to be committed;

5

3. The defendant Thomas Vigil intended that the shooting at a motor vehicle be committed;

4. During the commission of the felony Carlos Escobar was killed;

5. The defendant Thomas Vigil helped, encouraged or caused the killing to be committed;

6. The defendant Thomas Vigil intended the killing to occur or knew that he was helping to create a strong probability of death or great bodily harm;

7. The defendant did not act in self defense;

8. This happened in New Mexico on or about the 21st day of October, 2005.

**{17}** Defendant argues there was insufficient evidence to prove elements 2, 3, 5, and 6 beyond a reasonable doubt. To support jury findings on those elements, the State relies on: (1) the ongoing feud over the debt Escobar owed Anthony Jacquez; (2) Defendant's participation in assaulting Escobar several hours before the shooting; (3) Defendant's close association with the principals involved in killing Escobar; (4) Defendant's provoking an altercation with Escobar by throwing rocks, screaming obscenities, and punching Escobar; conflicting testimony as to whether Defendant may have had a pistol or shot it during his own encounter with Escobar; and (6) Defendant's likely awareness that one or more of his friends had been staying at the trailer across the road, and the resulting inferences that he might have expected them to be at the residence, that his own loud confrontation with Escobar would have been heard by his friends, and that hearing the commotion would have encouraged them to join the affray and "to kill Escobar to avenge his shooting of Thomas Vigil."

**{18}** None of these factors, individually or collectively, gives rise to any reasonable conclusion that Defendant engaged in any of the behavior with the intent to encourage others to commit either the predicate felony of shooting at Escobar's vehicle or the killing of Escobar. All of it was consistent instead with Defendant's acting only out of an intent to confront Escobar himself. In fact, the trial evidence was that Defendant was surprised at seeing Escobar's vehicle at the Martinez trailer. There was not a shred of evidence that Defendant called out for help to anyone, that he made any attempt to summon the shooters, that he even glanced in the direction from which they might come, or that he made any statement or took any action that indicated he was aware they were anywhere in the vicinity.

**{19}** The circumstantial evidence that Defendant expected the principal shooters to be at the trailer next door was only that Defendant, the Jacquez brothers, and Larry Abeyta had been known to "hang out" there from time to time. No evidence was presented that Defendant had any communication with the Jacquez brothers or Abeyta once Anthony Jacquez and Defendant parted company earlier that day. Whatever prompted the principals to run to the county road and shoot at Escobar's vehicle as it backed down the driveway of the Martinez trailer onto the county road was not established at trial. Although "evidence of aiding and abetting may be as broad and varied as are the means of communicating

6

thought from one individual to another; by acts, conduct, words, signs, or by any means sufficient to incite, encourage or instigate commission of the offense," *State v. Ochoa*, 41 N.M. 589, 599, 72 P.2d 609, 615 (1937), we have a duty to "assure that the basis of a conviction is not mere speculation." *State v. Apodaca*, 118 N.M. 762, 766, 768, 887 P.2d 756, 760, 762 (1994) (holding that there was sufficient evidence to sustain a finding that a defendant aided her mother in killing her husband where she repeatedly discussed murdering her husband, sought advice about how to do so, attempted to solicit three persons to commit murder for her, expressed that she would lose her husband's house if she got a divorce, borrowed a gun, concocted a false cover story as to her activities the day before and after the murder, and accompanied her mother to the place where the murder weapon was hidden). *See* UJI 14-6006 NMRA (providing that a jury's "verdict should not be based on speculation, guess or conjecture").

**{20}** The chain of inferences relied on by the State to support a conclusion that Defendant intended to perform any act of aiding and abetting amount to no more than guess or conjecture, rather than a sufficient basis upon which to find guilt beyond a reasonable doubt. "For the jury to have reached [the conclusions necessary to the verdict, it] had to speculate. This it may not do." *State v. Malouff*, 81 N.M. 619, 621, 471 P.2d 189, 191 (Ct. App. 1970) (reversing a conviction for insufficiency and noting that while a reviewing court views the evidence and inferences in the light most favorable to the verdict, this proposition does not replace the requirements of proof).

**{21}** The facts in this case are very similar to those in *State v. Salazar*, 78 N.M. 329, 331, 431 P.2d 62, 64 (1967) (explaining that an aider and abettor must share the criminal intent and purpose of the principals). In *Salazar*, this Court held the evidence insufficient to support a conviction for aiding and abetting a robbery where there was a complete absence of any evidence to support a conclusion that Salazar intentionally assisted in the robbery. *Id.* After pulling into a gas station, Salazar and two driving companions had an altercation with the station attendant, who subsequently pulled a gun and shot Salazar. *Id.* at 330, 431 P.2d at 63. Salazar collapsed on the ground before being picked up and placed in the car by his companions. *Id.* Salazar's two companions then stole two tires from the station by placing them in the backseat of the car and driving off. *Id.* All three were quickly apprehended by the police when their car stalled. *Id.* Salazar expressed no manifestation of approval or encouragement to take the tires. *Id.* at 331, 431 P.2d at 64. As in this case, Salazar was incapacitated before the principals committed their criminal acts. We concluded that the record was "replete with evidence suggesting he was incapable of performing any act or forming the requisite criminal intent." *Id.*

**{22}** We do not condone Defendant's behavior in either of the two assaults he committed on the day Escobar was killed. Nor do we express any desire to intrude on the legitimate role of the jury as trier of fact. However, we must honor our own responsibility to correct criminal convictions that are not founded on at least the bare minimum of sufficient supporting evidence. In this case, we must conclude that the jury was provided with insufficient evidence that Defendant committed any volitional act with the intent to

7

encourage or assist the principals in the shooting that resulted in Escobar's death. "If we were to hold otherwise, we would render the required elements of the [crime] meaningless." *State v. Duran*, 2006-NMSC-035, ¶ 16, 140 N.M. 94, 140 P.3d 515 (reversing tampering conviction for insufficiency where there was no evidence regarding an overt act by the defendant "and no reasonable way for a jury to infer intent"). We therefore exercise our duty to set aside the impermissible conviction and sentence for first-degree murder. Nothing in our result, of course, is intended to preclude the prosecution of Defendant for any criminal offenses that sufficient evidence shows he did commit.

## III.    CONCLUSION

{23}    The evidence was insufficient to support Defendant's conviction of aiding and abetting in the killing of Carlos Escobar. We therefore reverse his conviction and remand to the district court for proceedings consistent with this opinion.

{24}    **IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

**Topic Index for *State v. Vigil*, No. 30,896**

| **CL** | **CRIMINAL LAW** |
| --- | --- |
| CL-AC | Accessory |
| CL-AA | Aiding or Abetting |
| CL-CF | Capital Felony |
| CL-FM | Felony Murder |
| CL-HO | Homicide |
| CL-MU | Murder |

**AE**                   **APPEAL AND ERROR**
AE-SB            Substantial or Sufficient Evidence

**EV**                   **EVIDENCE**
EV-SS            Substantial or Sufficient Evidence