This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: February 16, 2026**

**No. S-1-SC-40460**

**STATE OF NEW MEXICO,**

> Plaintiff-Appellee,

v.

**PRECIOUS AGUILAR,**

> Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY**
**Emilio J. Chavez, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Santa Fe, NM
Mark A. Peralta-Silva, Assistant Appellate Defender
Albuquerque, NM

for Appellant

Raúl Torrez, Attorney General
Teresa M. Ryan, Assistant Solicitor General
Santa Fe, NM

for Appellee

### DECISION

**VIGIL, Justice.**

**{1}**      A jury convicted Defendant, Precious Aguilar, of accessory to first-degree murder, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994) (willful and deliberate) and NMSA 1978, Section 30-1-13 (1972); conspiracy to commit first-degree murder, contrary to NMSA 1978, Section 30-28-2(A), (B)(1) (1979); accessory to first-degree

kidnapping, contrary to NMSA 1978, Section 30-4-1(A)(4) (2003); accessory to aggravated battery, contrary to NMSA 1978, Section 30-3-5(A), (C) (1969); and tampering with evidence, contrary to NMSA 1978, Section 30-22-5 (2003). Defendant appeals her convictions and argues (1) there was insufficient evidence on all counts, and (2) the prosecutor engaged in prosecutorial misconduct by mischaracterizing testimony in closing argument, thereby confusing the jury and depriving Defendant of a fair trial. We affirm Defendant's convictions by nonprecedential decision. Rule 12-405(B)(1), (2) NMRA.

## I.    BACKGROUND

**{2}**    Defendant, then twenty, and Victim, Leroy Damasio Fresquez, were childhood friends. However, sometime shortly before Thanksgiving Day 2020, Victim forced her to leave her parents' house for about a week. Defendant said Victim held her "hostage," forced her to smoke methamphetamine, and raped her. When Defendant finally took Victim home, Defendant was scared because Victim had threatened to shoot her house and hurt her younger siblings who lived there. Defendant said that Victim, who had been kind before, now had guns, was using drugs, and was hanging around bad people.

**{3}**    The last time anyone saw Victim alive was on Thanksgiving Day, November 26, 2020. The circumstances surrounding Victim's murder are detailed in the trial testimony of Defendant's mother, Juanita; Defendant's father, Steve; and Defendant's friend, Ronnie. Except where otherwise noted below, the events of Thanksgiving Day are derived from Ronnie's testimony.

**{4}**    Ronnie's Thanksgiving Day started at a friend's house with his girlfriend, Camille. He and Camille got a ride to Zeke's house,[1] and while they were there, Victim and Defendant arrived in an SUV. Because Victim was acting "all crazy," aggressive, and amped up, they left the SUV in the yard and the five of them left in Zeke's white Chevy Malibu.

**{5}**    During the drive, Victim tried to shoot a man, but his gun jammed. When a police car started following the Malibu, Victim threw the gun out of the car near Garcia's Store and gave Defendant a stash of heroine for her to hold. After law enforcement left without incident, Victim continued to act like he was high and told Defendant and Camille to strip because he thought they had his stash on them. Victim asked Zeke for his gun telling him, "I'm going to make these b*tches strip." Victim was still not letting Defendant go at this time. They then drove back to Garcia's Store where Victim and Ronnie looked for the gun for about five to ten minutes without success. Ronnie testified that, as he was getting back into the Malibu, he heard Zeke tell Defendant, "Are you sure you want to do it 'cause there's going to be consequences." He could not remember what Defendant answered, but after having his memory refreshed, he said

---

[1]Because of his involvement in the events of Thanksgiving Day, Zeke pled to tampering with evidence, conspiracy to commit first-degree murder (felony murder), kidnapping (in the second degree) (accessory), tampering with evidence, and possession of a controlled substance (heroin), but he never testified because he died in jail in April 2023.

that Defendant said, "Yeah." Zeke drove the group back to Defendant's parents' house because Defendant wanted to go home.

**{6}**     Juanita, Defendant's mother, testified that when Defendant came home, she was concerned because Defendant "wasn't herself"—in a negative way. In fact, Defendant said that when she got home that Thanksgiving Day, she walked up to her mother and cried. Juanita admitted that Defendant "wasn't herself" on Thanksgiving and testified that Defendant told her Victim had raped her, but claimed she found out after Thanksgiving Day. However, during Juanita's testimony, Juanita testified that Defendant came home the day before Thanksgiving and "ran in the house, went to the back room, came running back out, and left." Juanita stated she asked Defendant if she was okay, and Defendant only responded that she loved Juanita before walking out the door. Further, Juanita said Victim's murder was "justifiable," and that she looked over at Defendant and knew "it was all worth it," because "My kids are my world." Given Juanita's statements and the details of Victim's murder, the jury was free to disregard her claim she did not learn Victim had raped Defendant until after Thanksgiving Day.

**{7}**     Defendant's father, Steve, gave similar testimony. He also claimed he heard rumors after Thanksgiving Day that Victim had taken Defendant "hostage" and raped her. However, he also said he would have "bl[own Victim's] head off" and gone after Victim's whole family had he known what Victim did to Defendant, and he did not think law enforcement could help. Steve also admitted he did not get into the car with the others when Victim was killed because, if he had, Victim would not have gotten in. In addition, Steve admitted he told a police officer in an interview that "we killed him" and that he knew Victim died on Thanksgiving Day because Ronnie and Juanita told him. So the jury was also free not to give credence to Steve's assertion that before Victim died, he did not know that Victim had kidnapped and raped Defendant.

**{8}**     It was in the foregoing context that Zeke drove the group back to Defendant's parents' house, and Defendant, Victim, and Zeke went into the house, while Ronnie and Camille stayed in the car. While everyone else stayed in the house, Victim returned to the car, got Zeke's knife from the center console, and put it in his pocket. Victim told Ronnie, "I think these f*ckers are plotting on me."[2]

**{9}**     After about ten to twenty minutes, Juanita, Zeke, Victim, and Defendant came out of the house and got in Zeke's car. Zeke was driving; Ronnie, Camille, and Juanita sat in the back seat; and Defendant sat on Victim's lap in the front passenger seat. As they were driving toward Vadito, New Mexico, Victim pulled out Zeke's knife. Juanita, who was seated behind Victim, asked to see the knife. Victim hesitated, but gave the knife to Juanita. A few minutes later, Juanita reached over the front seat and stabbed Victim at least five times with her left hand. During this time, Defendant was still on Victim's lap and leaning forward toward the windshield. Victim managed to take the knife from Juanita and tried to stab her.

---

2Victim's statement was ruled inadmissible hearsay by the district court during trial, but during Ronnie's cross-examination by defense counsel, unsolicited and unprompted, Ronnie made the statement. Defense counsel quickly moved on but did not move to strike the testimony.

**{10}** Zeke stopped the car, took out his gun, pointed it at Victim's face and said, "Don't even try it." Ronnie knocked the knife out of Victim's hand. Juanita then "pulled out a big old kitchen knife" concealed under her thigh and started stabbing Victim again, approximately twenty times. Defendant stayed sitting on Victim's lap and leaning against the dashboard towards the windshield of the car, trapping Victim in the seat. Defendant did not open the door for Victim to escape. Ronnie got out and opened the passenger door because Victim was struggling, and Victim and Defendant got out of the car. Defendant and Camille then walked toward the highway, and Victim ran toward the mountains.

**{11}** Juanita ran after Victim with Zeke's gun, and Ronnie heard one gunshot. Juanita returned to the car where Zeke was because the gun had jammed and retrieved her knife. Juanita and Zeke ran back to the mountains. Ronnie acknowledged he did not see what happened when Zeke and Juanita ran into the mountains. Victim's ex-girlfriend testified that on Thanksgiving Day she saw Zeke and a woman walking on the side of the highway towards Peñasco, which was unusual. Ronnie, driving Zeke's car, picked up Defendant and Camille and drove them to Defendant's parents' house.

**{12}** Defendant then told Ronnie to drive the car to El Valle and park it at Defendant's grandfather's property. Later, Zeke and Defendant, driving Zeke's car, picked up Ronnie. The car had been cleaned but no one explained who cleaned it or how. In addition, a neighbor of Defendant's parents testified that she saw Defendant get out of Zeke's white car and yell, "Dad, dad, I need to talk to you, Dad, I need to talk to you; . . . we have to pick-up Ronnie." The neighbor testified that she thought she heard Defendant say something like, "they stabbed him; they stabbed him all kinds." The neighbor also saw Juanita picking up trash and cleaning the white Chevy Malibu.

**{13}** In early March 2021 in Peñasco, New Mexico, in the same area where Juanita had chased Victim, Victim's remains were found. The examination of Victim's remains did not disclose Victim's cause of death. The investigation revealed communications between cell phones registered to Juanita and Zeke made on Thanksgiving Day 2020 and on March 8, 2021, the day Victim's remains were found, and on March 9, 2021, with no calls in between. Shortly after Thanksgiving, Ronnie wrote a letter detailing the events of Thanksgiving Day and sent it to his aunt because he felt bad and wanted to clear his conscience. His aunt gave the letter to the police in early May 2021. Zeke's knife, which Ronnie had thrown out the car window, was recovered and forensics found Victim's DNA on the handle. However, the kitchen knife was not recovered.

**{14}** At the close of the State's case, Defendant moved for a directed verdict on all counts. The district court granted Defendant's motion on one of two tampering with evidence charges only. The jury found Defendant guilty of the remaining charges. Defendant now appeals her convictions. Defendant asserts the evidence the State presented failed to establish that Defendant intended Juanita to kill Victim. Additionally, Defendant argues that the prosecutor's statements during closing likely confused the jury and deprived her of a fair trial.

## II. DISCUSSION

### A. Standard of Review

**{15}** The sufficiency of the evidence is measured against the jury instructions, which "become the law of the case." *State v. Arrendondo*, 2012-NMSC-013, ¶ 18, 278 P.3d 517 (internal quotation marks and citation omitted). Evidence is sufficient when substantial evidence, direct or circumstantial, "'exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction.'" *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (quoting *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314).

**{16}** We review a district court's decision to overrule an objection at trial under an abuse of discretion standard. *State v. Sosa*, 2009-NMSC-056, ¶ 26, 147 N.M. 351, 223 P.3d 348. "We will find an abuse of discretion if a court's ruling is clearly untenable or contrary to logic and reason." *Freeman v. Fairchild*, 2018-NMSC-023, ¶ 29, 416 P.3d 264 (internal quotation marks and citation omitted).

### B. Sufficient Evidence Supported Defendant's Convictions

**{17}** When considering the sufficiency of the evidence, this Court "does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285 (internal quotation marks and citation omitted). We have stated that when reviewing the sufficiency of the evidence, "[w]e do not search for inferences supporting a contrary verdict or re-weigh the evidence because this type of analysis would substitute an appellate court's judgment for that of the jury." *Id.* Instead, "[w]e view the evidence as a whole and indulge all reasonable inferences in favor of the jury's verdict," *id.*, while at the same time asking whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* ¶ 7 (internal quotation marks and citation omitted). It is "the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture." *State v. Vigil*, 2010-NMSC-003, ¶ 4, 147 N.M. 537, 226 P.3d 636 (internal quotation marks and citation omitted). An inference is reasonable if it flows from the facts in evidence, making it probable. *State v. Montoya*, 2021-NMCA-006, ¶ 12, 482 P.3d 1285.

**{18}** However, this Court is bound to find sufficient evidence of deliberate intent where substantial evidence, direct or circumstantial, supports a verdict of guilt. "Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *State v. Sosa*, 2000-NMSC-036, ¶ 9, 129 N.M. 767, 14 P.3d 32 (internal quotation marks and citation omitted). Substantial evidence of deliberation can include "earlier confrontation[s] . . . or other common areas of friction leading to violence," *State v. Tafoya*, 2012-NMSC-030, ¶ 52, 285 P.3d 604, fleeing the scene, disposing of evidence, or concocting false alibis. *State v. Flores*, 2010-NMSC-002, ¶¶ 22-23, 147 N.M. 542, 226 P.3d 641 (*overruled on other grounds by, State v. Martinez,* 2021-NMSC-002, ¶ 87, 478 P.3d 880). "A defendant's 'mere presence without

some outward manifestation of approval is insufficient' to uphold a conviction on a theory of accessory liability." *State v. Torres*, 2018-NMSC-013, ¶ 44, 413 P.3d 467 (citation omitted).

**{19}**    Defendant contends that the State did not meet its burden to prove Juanita's deliberate intent beyond a reasonable doubt, as required for accessory to first-degree willful and deliberate murder and asks the Court to vacate Defendant's convictions. In her brief, Defendant argues that for the jury to find there was a motive for Victim's killing, "it had to speculate that (1) either Juanita knew about the assault despite the lack of evidence supporting this, or (2) there was some other motive not specified at trial."

**{20}**    The jury had to consider and find the following elements of the accessory instruction: "1. The defendant intended that another person commit the crime; 2. Another person committed the crime; 3. The defendant helped, encouraged or caused the crime to be committed"; and find the following elements of the provided first-degree murder instruction: (1) Defendant killed Victim, (2) the killing was with deliberate intent to take away Victim's life, and (3) the act happened in New Mexico.

**{21}**    A reasonable jury could have found beyond a reasonable doubt that Defendant intended for Juanita to kill Victim based on the evidence presented at trial. Defendant had a motive to hurt Victim because Defendant alleged Victim had kidnapped, drugged, and raped her right before Victim's death. Defendant told authorities that she left with Victim before Thanksgiving because Victim threatened to shoot her house and hurt her family and she wanted to keep her parents and younger siblings safe. Defendant stated that she did not want to call the authorities because she believed they could not help her. Moreover, trial testimony supports a jury finding that both parents knew, before Victim was killed, that Victim had kidnapped, drugged, and raped Defendant.

**{22}**    Juanita testified that Defendant was not herself and was concerned about Defendant because it looked as if she had been crying. Juanita brought her own kitchen knife and concealed it under her leg. Juanita considered Victim's death "justifiable" and would do anything to help Defendant. Therefore, the jury was free to disregard Juanita's claim that she did not learn Victim had kidnapped, drugged, and raped Defendant until after Thanksgiving Day.

**{23}**    Further, even when Zeke stopped the car and Juanita continued to stab Victim and when Zeke pulled out a gun and pointed it at Victim, Defendant chose not to act. Defendant did not open the door. Defendant did not move to allow Victim to open the door, thereby trapping Victim. Defendant only got out of the car when Ronnie opened the door to let Victim out. Defendant was sitting on Victim's lap and leaning forward on the dashboard, trapping Victim, while Victim was being stabbed.

**{24}**    Finally, Victim's sudden concern for his safety, Victim's retrieval of the knife from the car, and Juanita's concern for Defendant in addition to bringing and concealing a kitchen knife with her in the car could have led a rational juror to conclude Defendant intended that Juanita kill Victim.

**{25}** Therefore, the evidence was sufficient for a reasonable juror to find that Defendant formed the requisite deliberate intent and is guilty of accessory to first-degree willful and deliberate murder.

**{26}** Additionally, the same evidence supports Defendant's guilt as an accessory to conspiracy, first-degree kidnapping, and aggravated battery. Defendant's interaction with Zeke before the car ride, in which Defendant expressed willingness to move forward with a plan at the expense of "consequences," in addition to not reacting to Victim getting stabbed and not allowing Victim to get out of the car, reasonably led the jury to conclude beyond a reasonable doubt that Defendant was guilty of those charges. The evidence established that Defendant and other individuals transported Victim in the car to another location, where Victim was repeatedly stabbed, and Defendant restrained Victim by sitting on his lap. The jury could reasonably rely on this evidence to conclude that each element of conspiracy, first-degree kidnapping, and aggravated battery was met to find Defendant guilty.

**{27}** Further, the uncontested facts also support the jury's guilty verdict as to tampering with evidence. Testimony at trial established Defendant directed Ronnie to take the car to her grandfather's property, Ronnie testified there was blood in the car that was cleaned up, and Juanita's neighbor saw Juanita cleaning the car and throwing out trash. The jury instruction defining the tampering with evidence crime elements only required the jury to determine that Defendant "hid a Chevy Malibu." As a result, the jury was justified in concluding Defendant was guilty of tampering with evidence based on the evidence presented at trial.

## C.   Prosecutorial Misconduct

**{28}** Defendant asserts that prosecutorial misconduct amounting to reversible error resulted when the prosecutor referred to two statements which stemmed from Ronnie's testimony: "They're plotting on me" and "We got the f*cker." Defendant argues this was misconduct because the first statement was inadmissible and the second statement was based on facts not in evidence. We disagree that prosecutorial misconduct amounting to reversible error resulted from the reference to the two statements.

**{29}** The first statement was the unsolicited and unprompted statement from Ronnie during defense counsel's examination that Victim said, "I think these f*ckers are plotting on me." During closing argument, the prosecutor highlighted that Victim made this statement while retrieving Zeke's knife and argued this showed Victim was aware that something was not right. Defendant objected and the objection was properly overruled. As we have already pointed out, although the statement was initially ruled to be inadmissible hearsay, Ronnie testified to the statement unprompted and unsolicited in response to cross-examination by defense counsel, who did not move to strike the testimony, and continued with the cross-examination. Therefore, the first statement was a fact in evidence. Because the district court did not err, there is no need to analyze further whether "the weight of the error meets the threshold required to reverse a conviction." *Sosa*, 2009-NMSC-056, ¶ 26.

**{30}** The second contested statement during the prosecutor's closing argument arose from the letter Ronnie wrote to his aunt. During the trial, Ronnie affirmed he wrote in the letter that Defendant referred to Victim as a "f*cker," but Ronnie never put the word in context and only testified that Defendant "was telling her dad that they stabbed him all kinds of times." In closing argument, however, the prosecutor misquoted the statement elicited at trial, arguing Ronnie stated that Defendant said, "*We* got the f*cker." Defense counsel objected, and without argument, the district court overruled the objection. Then defense counsel, during closing argument, highlighted the discrepancy between Ronnie's testimony and the prosecutor's representation of what Defendant had said.

**{31}** When reviewing prosecutorial misconduct in closing arguments, this Court has identified three factors to consider: "(1) whether the statement invades some distinct constitutional protection; (2) whether the statement is isolated and brief, or repeated and pervasive; and (3) whether the statement is invited by the defense." *Sosa*, 2009-NMSC-056, ¶ 26. All of these factors are assessed "objectively in the context of the prosecutor's broader argument and the trial as a whole." *Id.* We look at the trial as a whole to determine whether "the prosecutor['s] comments materially altered the trial or likely confused the jury by distorting the evidence, and thereby deprived the accused of a fair trial." *Id.* ¶ 34.

**{32}** Considering the first *Sosa* factor, the Court is more likely to conclude that there is reversible error when the prosecutor's comments invade "a distinct constitutional protection." *Id.* ¶ 27. Here, neither comment invaded a distinct constitutional protection.

**{33}** As to the second *Sosa* factor, a prosecutor's isolated or brief comments during closing argument do not typically warrant reversal. *Id.* ¶¶ 29, 31. The prosecutor mentioned the statement "We got the f*cker" three times in quick succession in closing when arguing Defendant did not seem worried about Victim. Considering that the prosecutor's reference to this statement was isolated and brief, the second factor also weighs against prosecutorial misconduct.

**{34}** Finally, we look to the third *Sosa* factor—whether the statement was invited by the defense. *Id.* ¶ 33. Ronnie testified on direct examination that he heard Defendant tell her dad that "they" stabbed someone. The exchange which followed between the prosecutor and Ronnie was an attempt to refresh Ronnie's recollection regarding the contents of the letter. The prosecutor's subsequent attempt to elicit the statement "We got the f*cker" instead of "they stabbed him" was futile, with the result that the district court admitted Ronnie's statement. Defense counsel then brought up the statement during cross-examination, quoting his testimony as "they stabbed that f*cker." We conclude defense counsel opened the door to Ronnie's testimony by repeating and rephrasing the statement during cross-examination, so this factor also weighs against Defendant's prosecutorial misconduct claim.

**{35}** As in *Sosa*, we emphasize here that "in the final analysis context is paramount." *Id.* ¶ 34. In the context of the trial as a whole, the prosecutor's comment did not materially alter the trial, or confuse the jury by distorting the evidence, and thereby

Defendant was not deprived of a fair trial. Therefore, the three *Sosa* factors do not support Defendant's claim of reversible error resulting from prosecutorial misconduct.

### III.     CONCLUSION

**{36}**     We affirm the judgment and sentence.

**{37}     IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Chief Justice**

**C. SHANNON BACON, Justice**

**JULIE J. VARGAS, Justice**

**BRIANA H. ZAMORA, Justice**