This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date: January 4, 2018**

**NO. S-1-SC-35566**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**LUIS RAMON RAMIREZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**John A. Dean, Jr., District Judge**

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant


Hector H. Balderas, Attorney General
Laura Erin Horton, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Justice.**

**I.    INTRODUCTION**

{1}    A jury found Luis Ramirez (Defendant) guilty of willful and deliberate murder, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994); conspiracy to commit first-degree murder, contrary to NMSA 1978, Sections 30-28-2 (1979) and 30-2-1(A)(1); one count of shooting at or from a motor vehicle resulting in injury, contrary to NMSA 1978, Section 30-3-8(B) (1993); three counts of child abuse, contrary to NMSA 1978, Section 30-6-1(D)(1) (2009); and one count of aggravated assault with a deadly weapon, contrary to NMSA 1978, Section 30-3-2(A) (1963). With the exception of conspiracy, Defendant's convictions were based on evidence that he acted as an accessory to substantially similar crimes committed by his brother, Alejandro Ramirez (Alejandro). *See* NMSA 1978, § 30-1-13 (1972) ("A person may be charged with and convicted of the crime as an accessory if he [or she] procures, counsels, aids or abets in its commission and although he [or she] did not directly commit the crime . . . ."); *see also State v. Ramirez*, ____-NMSC-___, ¶¶ 1-4, ___ P.3d ___ (No. 35,629, December 21, 2017) (affirming Alejandro's convictions for first-degree murder, conspiracy to commit first-degree murder, aggravated assault,

2

tampering with evidence, and three counts of child abuse).

**{2}** Defendant challenges his convictions on four grounds in this direct appeal. First, he argues that his convictions must be reversed due to insufficient evidence. Second, he contends that his convictions for conspiracy, shooting at a motor vehicle, and two counts of child abuse must be vacated because they violate the prohibition against double jeopardy. Third, he asserts that the jury instructions given at his trial for liability as an accessory and for conspiracy were deficient. And fourth, Defendant argues that the district court erred in imposing certain aspects of his sentence.

**{3}** We exercise jurisdiction under Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA and affirm Defendant's convictions for first-degree murder, conspiracy, three counts of child abuse, and aggravated assault. We vacate Defendant's conviction for shooting at a motor vehicle on double jeopardy grounds under *State v. Montoya*. 2013-NMSC-020, ¶ 54, 306 P.3d 426. We remand Defendant's case for re-sentencing on the aggravated assault and child abuse convictions to allow the district court to explain its findings that the crimes were serious violent offenses under NMSA 1978, Section 33-2-34(L)(4)(o) (2015). Because Defendant raises no questions of law that New Mexico precedent does not already sufficiently address, we exercise our discretion under Rule 12-405(B)(1) NMRA to

dispose of this case by non-precedential decision.

## II.    BACKGROUND

{4}    On a sunny Saturday afternoon, Victim, Wife, and three of their children were sitting in their parked SUV, preparing to leave the Animas Valley Mall after they had stopped to buy Victim a hat for work. Wife was in the driver's seat; Victim was in the passenger's seat with his window open; sixteen-year-old C.M. was in the second row, seated directly behind Victim; fourteen-year-old N.M. was in the middle of the second row, seated between C.M. and an empty baby seat; and ten-year-old M.M. was seated in the third row. The family's SUV was surrounded on three sides by other vehicles, leaving reverse as their only option for pulling out of their parking space.

{5}    As Wife shifted the SUV into reverse, Alejandro walked up and leaned on the open window of Victim's door, preventing the family from leaving. Alejandro spoke with Victim for about five to eight minutes and asked him a series of questions, including how he was doing and whether he went to church, and he asked for Victim's phone number. Wife thought Alejandro appeared preoccupied and "sketchy," and she noticed that he was frequently checking his cell phone and texting. She left the SUV in reverse and kept her foot on the brake during their entire conversation.

{6}    After about five minutes, Alejandro asked Victim for a ride, and Wife refused.

4

Alejandro responded, "Never mind, my brother's here," and at that moment, a white Chevrolet Blazer screeched to a halt behind the family's SUV. The Blazer's driver had stopped two to three feet behind the SUV and had blocked the family in their parking space. The driver's window was open and the driver had positioned the Blazer with his side of the vehicle closest to the SUV. At Defendant's trial, Wife and C.M. identified Defendant as the driver of the Blazer.

{7}     Alejandro walked to the Blazer and spoke with Defendant for thirty seconds to a minute through the open driver's side window. Wife watched Alejandro and Defendant through her rearview mirror, and as the two men spoke, she saw Alejandro look back at the SUV "with a very, very dirty, evil look." C.M. and M.M. turned around in their seats so that they could watch Alejandro and Defendant talking to each other, only a few feet away. M.M., who was seated in the third row of the SUV, described the driver as wearing a black and silver football jersey and said that Alejandro and the driver "weren't very far" from him while they were talking. N.M. was texting on her cell phone and glanced back at the Blazer only briefly. But Wife and all three children saw the driver hand Alejandro an object through the Blazer's open window. C.M. described the handoff of the object as "really careful," "gently," "slow," and "aware." Almost immediately, Alejandro walked back to Victim's

window, said something to Victim, and shot him multiple times as he sat in the front passenger seat of the SUV. Alejandro then ran back to the Blazer and got in the passenger seat, and the Blazer sped away toward the main highway.

{8}    After Alejandro shot Victim, Wife heard the children screaming, and they later testified that they were scared and thought they were going to die. C.M., who was seated directly behind Victim, tried to help Victim by putting pressure on his head while he was being shot. A detective who later met Wife and the three children at the hospital later that afternoon described Wife as "distraught" and the children as "hysterical, crying[, and] shaking." The detective also described the family as having blood all over their clothing.

{9}    Victim died from his gunshot wounds. Five bullets were recovered from his body, including one from his lung, brain, neck, upper arm, and breast bone. Four additional bullets passed through Victim's body, exiting from his head, abdomen, upper back, and side flank. A crime-scene investigator who photographed the SUV testified about two "defects" inside the vehicle that were consistent with bullet holes, one in the window of the back door on the driver's side and one in the roof. The investigator also documented large amounts of blood throughout the inside of the SUV and in the second row of seats, in particular.

**{10}**      Roughly fifteen minutes after Alejandro had approached the family in their SUV, a deputy pulled Defendant over in response to a dispatch to locate a Blazer driven by a Hispanic male. Defendant and his passenger, Alejandro, were arrested. Defendant was wearing a black and silver jersey, as M.M. had described.

**{11}**      After a two-day trial a jury found Defendant guilty of willful and deliberate murder, conspiracy to commit willful and deliberate murder, shooting at a motor vehicle, three counts of child abuse, and one count of aggravated assault. The jury acquitted Defendant of one count of tampering with evidence. The district court sentenced Defendant to life in prison, plus sixty-eight years and six months. The district court also found that the three counts of child abuse and one count of aggravated assault were serious violent offenses, limiting Defendant's eligibility for earned meritorious deductions to a maximum of four days per month of time served. Defendant appeals.

## III.      DISCUSSION

### A.      Sufficiency of the Evidence

**{12}**      Defendant challenges the sufficiency of the evidence for each of his convictions with the exception of his conviction for shooting at a motor vehicle, which he challenges on other grounds. When reviewing the sufficiency of the evidence, we

7

evaluate "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. Evidence must be viewed in the light most favorable to the verdict, "indulging all reasonable inferences and resolving all conflicts in the evidence" in the verdict's favor. *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641. "In our determination of the sufficiency of the evidence, we are required to ensure that a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). When a jury's verdict is supported by substantial evidence, the verdict will not be disturbed on appeal. *See State v. Day*, 2008-NMSC-007, ¶ 15, 143 N.M. 359, 176 P.3d 1091. We address each of Defendant's challenges to the sufficiency of the evidence in turn.

**1.      First-degree murder**

{13}      The first issue raised by Defendant is whether the State failed to prove that Defendant had the same intent as the principal, Alejandro, to sustain a conviction for willful and deliberate first-degree murder as an accessory. Specifically, Defendant argues that the jury's finding of deliberate intent was speculative because the evidence

8

presented at trial was sufficient to support a finding that only Alejandro had the requisite intent to kill Victim.

**{14}** In New Mexico, "A person may be . . . convicted of the crime as an accessory if he [or she] procures, counsels, aids or abets in its commission" by another. Section 30-1-13. A person who aids or abets in the commission of a crime is equally culpable as the principal. *State v. Carrasco*, 1997-NMSC-047, ¶ 6, 124 N.M. 64, 946 P.2d 1075. To be found guilty, "a jury must find a community of purpose for *each* crime of the principal." *Id.* ¶ 9. "This . . . means that a jury must find that a defendant *intended* that the acts necessary for *each* crime be committed; a jury cannot convict a defendant on accessory liability for a crime unless the defendant intended the principal's acts." *Id.*; *see also State v. Vigil*, 2010-NMSC-003, ¶ 15, 147 N.M. 537, 226 P.3d 636 (discussing the two requirements of accessory liability: (1) "intent by a defendant that another person commit the offense," and (2) "an act on a defendant's part to cause the other person to commit it").

**{15}** " 'The question of whether the alleged aider and abettor did share the principal's criminal intent, and whether he [or she] knew the latter acted with criminal intent, is one of fact for the jury and may be inferred from circumstances.' " *State v. Riley*, 1970-NMCA-015, ¶ 5, 82 N.M. 298, 480 P.2d 693 (quoting *State v. Ochoa*,

1937-NMSC-051, ¶ 44, 41 N.M. 589, 72 P.2d 609). "This intent can be inferred from behavior which encourages the act or which informs the confederates that the person approves of the crime after the crime has been committed." *Carrasco*, 1997-NMSC-047, ¶ 7. We repeatedly have observed that intent "is rarely established by direct evidence" and "is almost always inferred from other facts in the case." *See, e.g.*, *State v. Sosa*, 2000-NMSC-036, ¶ 9, 129 N.M. 767, 14 P.3d 32 (quoting *State v. Vigil*, ¶ 2, 1990-NMSC-066, 110 N.M. 254, 794 P.2d 728).

{16}     Turning to the substantive crime at hand, "Murder in the first degree is the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate[,] and premeditated killing." Section 30-2-1 (A)(1). To be deliberate, the intention to kill must be "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14-201 NMRA. "Though deliberate intent requires a calculated judgment to kill, the weighing required for deliberate intent may be arrived at in a short period of time." *State v. Guerra*, 2012-NMSC-027, ¶ 28, 284 P.3d 1076 (internal quotation marks and citation omitted). Thus, to support a conviction of willful and deliberate first-degree murder as an accessory, the State needed to introduce sufficient evidence that Defendant had the deliberate intention to kill Victim and that he aided

and abetted Alejandro in doing so. *See Vigil*, 2010-NMSC-003, ¶ 15.

{17}    We have held that sufficient evidence supported a robbery conviction when the defendant was "the driver of the car, kept the motor running, saw what occurred[,] and drove the get-away car." *State v. Lucero*, 1957-NMSC-062, ¶ 4, 63 N.M. 80, 313 P.2d 1052; *see also Carrasco*, 1997-NMSC-047, ¶¶ 10-19 (finding sufficient evidence that the defendant intended multiple violent crimes based in part on evidence of his involvement as the getaway driver from the scene of a robbery). In Defendant's case, the State introduced evidence that Defendant aided Alejandro in Victim's murder in much the same way. Like the defendant in *Lucero*, Defendant was the driver of the Blazer, waited nearby in the Blazer while Alejandro killed Victim, and drove Alejandro away from the scene after the crime.

{18}    But the evidence of Defendant's involvement and intent in killing Victim did not end there. The jury also heard evidence that Defendant blocked Victim and his family in their parking spot by screeching to a halt two to three feet behind their SUV and that Defendant continued to prevent them from leaving while he (1) spoke with Alejandro for up to one minute, (2) handed an object to Alejandro immediately before the shooting, and (3) waited for Alejandro to walk back to Victim's window, shoot Victim, and return to the Blazer before driving Alejandro away from the crime scene.

11

Reviewing the facts in the light most favorable to the verdict, a reasonable juror could find this evidence sufficient to support the jury's finding that Defendant had the deliberate intent necessary to sustain a conviction of first-degree murder as an accessory. *See Lucero*, 1957-NMSC-062, ¶ 4; *see also Carrasco*, 1997-NMSC-047, ¶¶ 10-19; *cf. Flores*, 2010-NMSC-002, ¶ 23 ("[E]vidence of flight . . . may prove consciousness of guilt.").

**2.      Conspiracy to commit first-degree murder**

**{19}**      Defendant next challenges the sufficiency of the evidence to support his conviction of conspiracy to commit first-degree murder. He argues that the jury's inference that Defendant and Alejandro plotted to kill Victim relies on speculation, as opposed to direct or circumstantial evidence.

**{20}**      "Conspiracy consists of knowingly combining with another for the purpose of committing a felony . . . ." Section 30-28-2(A). To be convicted of conspiracy, "the defendant must have the requisite intent to agree and the intent to commit the offense that is the object of the conspiracy." *State v. Varela*, 1999-NMSC-045, ¶ 42, 128 N.M. 454, 993 P.2d 1280. "The criminal agreement is the gist of the crime of conspiracy. A conspiracy is complete when the agreement is entered." *Carrasco*, 1997-NMSC-047, ¶ 39 (citation omitted). The agreement can be verbal or can be inferred from acts

12

demonstrating that the conspirator knew of and engaged in the scheme. *State v. Trujillo*, 2002-NMSC-005, ¶ 62, 131 N.M. 709, 42 P.3d 814; *see also State v. Bahney*, 2012-NMCA-039, ¶ 37, 274 P.3d 134 ("[T]he crime of conspiracy is rarely proven by direct evidence.").

{21}    Viewing the evidence in the light most favorable to the verdict, a reasonable juror could infer that Defendant and Alejandro conspired to murder Victim. Alejandro approached the family's SUV, leaned on the vehicle's window so they could not leave, and appeared "sketchy" and preoccupied while he questioned Victim for five to eight minutes and frequently checked and texted on his cell phone. Defendant then arrived at the scene, stopped directly behind the family's SUV, and blocked them in their parking space. The jury could infer that Alejandro was communicating with Defendant while he was talking with Victim and stalling until Defendant arrived. Once Defendant arrived, he and Alejandro talked for about a minute, during which Alejandro looked back at the SUV with a "very, very dirty, evil look." Defendant then handed Alejandro an object in a manner that C.M. described as "really careful," "gently," "slow," and "aware." Given what followed, this sequence of events provided the jury with ample evidence to support an inference that Alejandro and Defendant agreed to murder Victim as he sat in his SUV with his family. *Cf. State v. Sarracino*,

1998-NMSC-022, ¶ 29, 125 N.M. 511, 964 P.2d 72 (holding that evidence of the defendant's participation with four other people in the beating of the victim at two different locations was sufficient to support the defendant's conviction of conspiracy to commit first-degree murder). Sufficient evidence therefore supported Defendant's conviction of conspiracy to commit first-degree murder.

**3.     Child abuse**

{22}     Defendant next argues that there is insufficient evidence to support his three convictions of child abuse not resulting in death or great bodily harm. Specifically, Defendant contends that the State failed to prove that he knew that the children were in the family's SUV, particularly given evidence that the windows were tinted. Defendant further argues that, even if he had seen individuals in the back of the SUV, two of the children were teenagers so he may not have known they were children. And Defendant argues that the State failed to prove that he had the intent necessary to support a conviction of child abuse as an accessory.

{23}     We addressed a similar set of arguments in *State v. Arrendondo*, 2012-NMSC-013, ¶¶ 23-24, 278 P.3d 517. In *Arrendondo*, the defendant was convicted of two counts of child abuse by endangerment for firing at least two gunshots into a home where an infant and an eleven-year old were present. *See id.* The defendant argued that

14

the State had failed to prove that he knew of the children's presence in the house when he fired the shots. *Id.* We analyzed the issue as whether the State had proven that the defendant had acted with reckless disregard for the children's safety. *Id.* ¶ 24.

{24} After reviewing the relevant statute, uniform jury instruction, and case law, we concluded that, to prove reckless disregard, the State had to prove that the defendant "knew or should have known that the child victims were present in the zone of danger he created." *Id.* ¶ 26. We reasoned that, without such proof, "the [abuse] of the children would be accidental or unknowing rather than negligent, and accidental conduct cannot support a conviction for negligent child abuse." *Id.* ¶ 26. We applied that standard and concluded that sufficient evidence supported the conviction for child abuse of the infant based on testimony that the defendant was told before the shooting that there was a newborn baby in the house. *Id.* ¶ 27. The child abuse conviction related to the eleven-year old, however, was not supported by sufficient evidence because no evidence had been introduced that the defendant knew or should have known that another child was in the house. *Id.* ¶ 28.

{25} Since *Arrendondo*, the jury instruction for child abuse has been amended to reflect our more recent jurisprudence in this area of law. *See* UJI 14-612 NMRA; *see also, e.g.*, *State v. Consaul*, 2014-NMSC-030, ¶ 25, 332 P.3d 850 (holding that the

15

jury needs to agree unanimously on the conduct that caused harm to the child); *Id.* ¶¶ 37-40 (holding that the proper standard for the lowest level of child abuse under Section 30-6-1(D) is "recklessness" and that juries should no longer be instructed on "negligent" child abuse); *State v. Montoya*, 2015-NMSC-010, ¶ 33, 345 P.3d 1056 (holding that when the abuse does not result in the death of a child under twelve, it is unnecessary to specify a particular *mens rea* so long as the State proves that "the defendant acted knowingly, intentionally *or* [recklessly]" (alteration in original)).

{26} The changes to the jury instruction, however, are immaterial to this case. Under either version of the instruction, there was sufficient evidence for the jury to infer that Defendant actually knew that the children were in the family's SUV when he aided and abetted Alejandro in firing a gun into the vehicle. Unlike the children in *Arrendondo*, who were obstructed from view by the solid walls of a house, the children in this case were surrounded by windows in the back of a vehicle. Given the evidence of Defendant's close proximity to the back of the SUV and the sunny conditions that day, the jury reasonably could have inferred that Defendant actually saw the children. Moreover, all three children testified that they turned around and looked at Alejandro and Defendant while the two men were talking only a few feet away. C.M. and M.M., in particular, testified that they watched the entire conversation

16

and that Alejandro and Defendant "weren't very far" from ten-year-old M.M, who was seated in the third row of the SUV. That the SUV's windows were tinted does not undermine the jury's verdict. *See State v. Astorga*, 2015-NMSC-007, ¶ 57, 343 P.3d 1245 (" 'Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the defendant's] version of the facts.' " (quoting *Duran*, 2006-NMSC-035, ¶ 5) (alteration in original)). When viewed in the light most favorable to the verdict, the evidence was sufficient to infer that Defendant saw the children in the back of the SUV. The same evidence supports an inference that Defendant recklessly disregarded the children's health and safety when he aided Alejandro in firing a gun into the vehicle.

**4. Aggravated Assault**

{27} For his last challenge to the sufficiency of the evidence, Defendant contends that the State failed to prove that he had the requisite intent for the aggravated assault of Wife. As with his challenge to the evidence supporting the child abuse convictions, Defendant argues that the State failed to prove that he knew Wife was in the SUV or that he intended Alejandro to assault her. Assault consists of "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he [or she] is in danger of receiving an immediate battery[.]" NMSA 1978, § 30-3-1(B)

(1963); UJI 14-305 NMRA. The offense is aggravated when it is committed with a deadly weapon. Section 30-3-2(A).

{28} Viewing the facts in the light most favorable to the verdict, a reasonable juror could infer that Defendant knew Wife was in the family's SUV and that he intended Alejandro to fire the gun into the vehicle. In addition to the evidence reviewed above that Defendant could actually see into the SUV, the jury heard testimony that Defendant drove up while Alejandro was speaking with Victim through the open window of the *passenger* seat of the SUV. And Wife testified that she left the SUV in reverse and had her foot on the brake until after Defendant sped away from the parking lot. The jury therefore could infer that Defendant knew that someone other than Victim was in the driver seat of the vehicle. There was sufficient evidence to sustain Defendant's aggravated assault conviction as an accessory. *Cf. State v. Manus*,1979-NMSC-035, ¶¶ 12-14, 93 N.M. 95, 597 P.2d 280 (holding that, for the crime of aggravated assault, the State was required to prove only that the defendant had committed an unlawful act that caused the victim to believe she was in danger of receiving an immediate battery, that the act was done with a deadly weapon, and that the act was done with a general criminal intent), *overruled by Sells v. State on other grounds*, 1982-NMSC-125, ¶¶ 9-10, 98 N.M. 786, 653 P.2d 162.

**B.** **Double Jeopardy**

{29} Defendant challenges a number of his convictions on double jeopardy grounds. We review a double jeopardy challenge de novo. *State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747. "The Fifth Amendment of the United States Constitution prohibits double jeopardy and is made applicable to New Mexico by the Fourteenth Amendment." *Id.* (citing U.S. Const. amends. V & XIV, § 1; *Benton v. Maryland*, 395 U.S. 784, 787 (1969)). The double jeopardy clause functions, in part, "to protect a criminal defendant against multiple punishments for the same offense." *Swick*, 2012-NMSC-018, ¶ 10 (internal quotation marks and citations omitted). Double jeopardy multiple-punishment cases can be classified in two ways. *Id.* In a double-description case, we consider whether the same conduct may permissibly result in multiple convictions under different statutes. *See id.* In a unit-of-prosecution case, we consider whether the same conduct may permissibly result in multiple convictions under the same statute. *See id.* Defendant asserts both types of double jeopardy multiple-punishment challenges, and we address each in turn.

**1.** **Shooting at a motor vehicle**

{30} Defendant argues, and the State correctly concedes, that we must vacate his conviction for shooting at a motor vehicle because his unitary conduct resulted in

19

multiple convictions under two different statutes. In *State v. Montoya*, we held that a defendant may not be punished for shooting at a motor vehicle and for a homicide when both offenses are based on the unitary act of shooting the victim. 2013-NMSC-020, ¶ 54 (overruling *State v. Gonzales*, 1992-NMSC-003, ¶ 12, 113 N.M. 221, 824 P.2d 1023 (holding that "there is no violation of double jeopardy principles for [the] defendant's punishment" for first-degree murder and shooting into an occupied motor vehicle)). We further held in *Montoya* that double jeopardy principles require the conviction carrying the shorter sentence to be vacated. 2013-NMSC-020, ¶ 55. We agree that *Montoya* applies in this case, and we therefore vacate Defendant's conviction of shooting at a motor vehicle, which carries a shorter sentence than his conviction of first-degree murder.

**2.     Child abuse**

{31}     Defendant next argues that two of his three convictions of child abuse should be vacated because they stem from unitary conduct. We recently held in our opinion affirming Alejandro's convictions that Alejandro's three convictions of child abuse did not violate double jeopardy under a unit-of-prosecution analysis. *See Ramirez*, ____-NMSC____, ¶¶ 56-57, ___ P.3d ___ (holding that Alejandro's three convictions of child abuse by endangerment did not violate double jeopardy when he shot at least

20

nine times into the SUV in which the three children were present and when the children "separately testified to the fear and shock that they suffered"). The same reasoning applies to Defendant as an accessory under the facts of this case, and we therefore hold that his three convictions for child abuse by endangerment do not violate double jeopardy.

**3.     Conspiracy to commit first-degree murder and first-degree murder as an accessory**

{32}     Defendant asserts that his convictions for first-degree murder as an accessory and conspiracy to commit first-degree murder stem from unitary conduct and arise under different statutes. As such, Defendant argues that the Legislature did not intend to punish the two crimes separately. *Swick*, 2012-NMSC-018, ¶ 11. Double description challenges involve a two-part test. *Swafford v. State*, 1991-NMSC-043, ¶¶ 25-34, 112 N.M. 3, 810 P.2d 1223. First, we consider whether the conduct underlying the multiple offenses was unitary. *Id*. ¶ 25. "If the conduct is not unitary, [then] the analysis ends and double jeopardy does not apply." *State v. Silvas*, 2015-NMSC-006, ¶ 9, 343 P.3d 616. If the conduct is unitary, however, then we consider "whether the [L]egislature intended to create separately punishable offenses." *Swafford*, 1991-NMSC-043, ¶ 25.

{33}     We long have recognized that aiding and abetting an offense and conspiracy to

21

commit the same offense are separate crimes that may arise from related, if not identical conduct. *See, e.g., Ochoa*, 1937-NMSC-051, ¶ 35 ("In many, if not most, conspiracy cases, where conviction results, the accused under the proof could as well have been convicted as an aider and abettor, without the conspiracy charge. This because nearly always he [or she] is found present actively participating in the homicide."); *State v. Luna*, 1979-NMCA-048, ¶ 10, 92 N.M. 680, 594 P.2d 340 ("Although aiding and abetting and conspiracy are separate offenses, the same set of facts is applicable to each offense in this case." (citation omitted)); *see also State v. Baca*, 1997-NMSC-059, ¶ 46, 124 N.M. 333, 950 P.2d 776 ("Accomplice liability and conspiracy are distinct and separate concepts." (internal quotation marks and citation omitted)). We also have held that "[t]he crimes of conspiracy and accessory to a crime are separate offenses based on separate acts for which the Legislature has intended multiple punishments." *Carrasco*, 1997-NMSC-047, ¶ 36 (citing *State v. Armijo*, 1976-NMCA-126, ¶ 18, 90 N.M. 12, 558 P.2d 1151). Under these well-established principles, Defendant's multiple punishment challenge must fail.

{34}     Defendant contends, however, that our opinion in *Silvas* requires a different result in this case because his convictions of first-degree murder as an accessory and of conspiracy to commit first-degree murder were based on "the same exact conduct."

22

We disagree. The defendant in *Silvas* was convicted both of trafficking a controlled substance by possession with intent to distribute and of conspiracy to commit the same crime. 2015-NMSC-006, ¶ 1. We held that a multiple punishment violation occurred because, *inter alia*, the State relied on a "single moment in time" to prove both crimes. *Id.* ¶ 10. We repeatedly emphasized that the sole evidence to support both convictions was a drug transaction—"the exact moment when [the defendant and the buyer] exchanged drugs for money." *Id.* ¶¶ 10, 18-21, 28.

{35} By contrast, the evidence in this case supporting Defendant's convictions was not "identical" and did not arise out of a single act or moment in time. *Id.* ¶ 10. The State argued that Defendant was guilty of first-degree murder as an accessory based on evidence that he (1) pulled up behind Victim and his family and blocked them in their parking space; (2) handed Alejandro an object which the State argued was a gun; (3) watched and waited while Alejandro shot Victim; and (4) kept the engine of the Blazer running and sped away after Alejandro shot Victim to death. Although the State did not argue a particular set of facts to support the conspiracy, the jury instruction included as an element that "[D]efendant and another person by words or acts agreed together to commit willful and deliberate murder[.]" The instruction therefore properly focused the jury on the agreement, which we have held " 'is the gist

23

of the crime' " of conspiracy. *See Baca*, 1997-NMSC-059, ¶ 46 (quoting *State v. Padilla*, 1994-NMCA-067, ¶ 10, 118 N.M. 189, 879 P.2d 1208). The evidence supporting Defendant's role as an accessory thus extended well beyond the evidence of the agreement to murder Victim, which was complete at or before the moment when Defendant handed Alejandro the gun. *See id.* (" 'The crime [of conspiracy] is complete when the felonious agreement is reached.' " (quoting *State v. Leyba*, 1979-NMCA-105, ¶ 2, 93 N.M. 366, 600 P.2d 312)).

{36} We therefore decline to extend *Silvas* to the facts of this case. Instead, we adhere to settled law and hold that Defendant's convictions of first-degree murder and conspiracy to commit first-degree murder do not violate double jeopardy. *See Carrasco*, 1997-NMSC-047, ¶ 36 ("The crimes of conspiracy and accessory to a crime are separate offenses based on separate acts for which the Legislature has intended multiple punishments.").

**C.    Jury Instructions**

{37} We next address Defendant's arguments related to the jury instructions at his trial. First, Defendant argues that the district court erroneously refused his request to instruct the jury using UJI 14-2823 NMRA, which addresses evidence that may be relevant to proving that a defendant aided and abetted a crime. Second, Defendant

24

contends that the conspiracy instruction omitted the intent element and therefore was incomplete. "The standard of review we apply to jury instructions depends on whether the issue has been preserved." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. If the error has been preserved, we review the instruction for reversible error. *State v. Cabezuela*, 2011-NMSC-041, ¶ 21, 150 N.M. 654, 265 P.3d 705. If the error has not been preserved, then we review the instruction for fundamental error. *Id.*

**1.      The district court did not err in denying Defendant's requested jury instruction on mere presence for accessory liability**

{38}    Defendant first challenges the district court's refusal to instruct the jury that "[m]ere presence . . . and even mental approbation, if unaccompanied by outward manifestation or expression of such approval, is insufficient to establish that the defendant aided and abetted a crime." UJI 14-2823. Defendant properly preserved this issue, and we therefore review for reversible error. *See Cabezuela*, 2011-NMSC-041, ¶ 21.

{39}    The district court refused UJI 14-2823 based on the instruction's use note, which states, "No instruction on this subject shall be given." We held in *State v. Smith* that "the trial court did not err when it followed the mandate of this Court and refused" the mere presence instruction based on the use note. 2001-NMSC-004, ¶ 30, 130 N.M. 117, 19 P.3d 254; *see also* UJI Criminal General Use Note ("No instruction

25

shall be given on a subject which a use note directs that no instruction be given.").

*Smith* controls this case, and we therefore conclude that the district court did not err when it refused the tendered instruction.

**2.      The conspiracy instruction did not result in fundamental error**

{40}      Defendant argues that the instruction on conspiracy in this case lacked the element of intent. Defendant failed to preserve this issue, and we therefore review for fundamental error.

> The exacting standard of review for reversal for fundamental error requires the question of guilt [be] so doubtful that it would shock the conscience [of the court] to permit the verdict to stand. With regard to jury instructions, fundamental error occurs when, because an erroneous instruction was given, a court has no way of knowing whether the conviction was or was not based on the lack of an essential element. Part of the fundamental analysis is whether a reasonable juror would have been confused or misdirected by the jury instruction.

*State v. Cabezuela*, 2015-NMSC-016, ¶ 37, 350 P.3d 1145 (alterations in original) (internal quotation marks and citations omitted).

> The Uniform Jury Instruction for the crime of conspiracy states:

>> For you to find the defendant guilty of conspiracy to commit _____ [as charged in Count _____], the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>> 1.   The defendant and another person by words or acts agreed together to commit _____;
>> 2.   The defendant and the other person intended to commit

26

_____;

        3.   This happened in New Mexico on or about the ___ day of _____, _____.

UJI 14-2810 NMRA (use notes omitted).

The jury in this case was instructed as follows:

For you to find the defendant guilty of conspiracy to commit Willful and Deliberate Murder as charged in Count 2, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
        1.     The defendant an another person by words or acts agreed together to commit willful and deliberate murder;
        2.     This happened in New Mexico on or about the 27th day of April, 2013.

Thus, Defendant rightly observes that the instruction given at his trial did not include the second element of the uniform instruction, that "[t]he defendant and the other person intended to commit [willful and deliberate murder]." *See also Baca*, 1997-NMSC-059, ¶ 46 (noting that the crime of conspiracy has "two intents": (1) the intent to agree, and (2) the intent " 'to achieve a particular result . . . covered by the law of conspiracy' " (quoting 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law*, § 6.4(e)(1-2), at 76-77 (1986))).

{41}    Though the instruction given at Defendant's trial varied from UJI 14-2810, the omission does not rise to the level of fundamental error under the facts of this case. We see no suggestion that the missing element may have confused the jury or that

27

Defendant's conviction may have been based on the lack of an essential element. Given that the jury unanimously found that Defendant and Alejandro "agreed together to commit willful and deliberate murder," their intent to commit the murder is self-evident in light of the events that followed the agreement. The erroneous instruction did not result in fundamental error.

**D.      Sentencing**

{42}      The parties agree that the district court erred in designating Defendant's convictions of aggravated assault and child abuse as serious violent offenses because no specific findings of fact were made on the record. *See* § 33-2-34(L)(4)(o) (providing that the crimes of aggravated assault and child abuse may be considered serious violent offenses "when the nature of the offense and the resulting harm are such that the court judges the crime to be a serious violent offense"); *see also State v. Morales*, 2002-NMCA-016, ¶¶ 2, 17-18, 131 N.M. 530, 39 P.3d 747 (reversing a determination that the defendant's conviction of second degree kidnapping was a serious violent offense because the district court failed to make sufficient findings).

{43}      Whether an offense is a serious violent offense affects a prisoner's eligibility for good time credit under the Earned Meritorious Deductions Act. *See* § 33-2-34(A)(2) (providing that a prisoner confined for committing a serious violent

offense is eligible to earn good time credit at a rate of "a maximum of four days per month of time served"). For the crimes of aggravated assault and child abuse to be serious violent offenses, the district court must make specific findings about "the nature of the offense and resulting harm." *See* § 33-2-34(L)(4)(o); *see also State v. Loretto*, 2006-NMCA-142, ¶ 14, 140 N.M. 705, 147 P.3d 1138 ("The court must . . . ultimately determine whether the crime was 'committed in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm.' " (quoting *Morales*, 2002-NMCA-016, ¶ 16)).

{44}     In this case, the district court made no specific findings at the sentencing hearing regarding the serious violent offense designation. Similarly, the judgment and sentence declared these convictions as serious violent offenses only "due to the nature of [the] offense and the resulting harm." We agree with the parties that these findings were insufficient. *See State v. Scurry*, 2007-NMCA-064, ¶ 6, 141 N.M. 591, 158 P.3d 1034 ("[T]he district court is required to explain its conclusions and findings and 'not leave it up to the appellate court either to speculate as to what the court relied on or to itself engage in judicial fact finding.' " (quoting *Loretto*, 2006-NMCA-142, ¶ 14)). We further agree that the proper remedy is to remand to the district court for re-

29

sentencing on Defendant's child abuse and aggravated assault convictions to permit the district court to make an adequate record that the crimes were serious violent offenses.

{45} Defendant also challenges his sentence for second-degree shooting at a motor vehicle, arguing that the jury was instructed on and made the findings necessary for the third-degree variation of the crime. *See* § 30-3-8(B) (providing that shooting at a motor vehicle is a third-degree felony when it results in injury and a second-degree felony when it results in great bodily harm). We agree that the district court erroneously sentenced Defendant for second degree shooting at a motor vehicle. But because we vacate the conviction on double jeopardy grounds, we need not address this argument in full.

## IV.   CONCLUSION

{46} We vacate Defendant's conviction for shooting at a motor vehicle and remand for re-sentencing on the aggravated assault and child abuse convictions so that the district court can make the findings necessary to conclude that the crimes are serious violent offenses. We affirm Defendant's remaining convictions and sentence.

{47}   **IT IS SO ORDERED.**


_____

30

                                        **BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

31